CENTRAL TRUST CO. v. THIRD AVE. R. CO.

(Circuit Court, S. D. New York. June 10, 1908.)

1. CARRIERS (§ 12*)—RECEIVERS—ADMINISTRATION OF PROPERTY—TRANSFERS.

A receiver for street railroad companies will not be required to continue an existing system of transfers in force between such companies and an independent company, not required by law nor contract, and which is unprofitable to the receivership; nor is it a sufficient ground for refusing permission to discontinue such transfers that the franchise of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

outside company may be thereby forfeited, where, after due notice to them, none of the parties interested in such franchise objects.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

**2.** CARRIERS (§ 12*)—ACQUISITION OF FRANCHISE IN STREETS—CONSENT OF PROPERTY OWNERS—CONDITIONS.

The consent of the owners of property abutting on a street to the extension of the line of a street railroad company thereon does not bind the company to continue a system of transfers with another company then existing, where no such condition is expressed therein.

[Ed. Note.- -For other cases, see Carriers, Dec. Dig. § 12.*]

**3.** STREET RAILROADS (§ 58*)—RECEIVERS—ADMINISTRATION OF PROPERTY.

A receiver for the property of street railroad companies will not be required to continue an arrangement by which such companies furnished power and the use of their tracks to an independent company without compensation.

[Ed. Note.- -For other cases, see Street Railroads, Dec. Dig. § 58.*]

In Equity. Suits by the Central Trust Company against the Third Avenue Railroad Company, by the Barber Asphalt Company against the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway Company, by the American Hay Company against the Dry Dock, East Broadway & Battery Railroad Company, and by the Lorain Steel Company against the Union Railway Company. The receiver of the defendant roads above enumerated has applied for instructions as to proposed discontinuance of transfers in addition to those considered in an earlier opinion of this court filed March 31, 1908 (161 Fed. 879).

Bowers & Sands, for Central Trust Co.

Evarts, Choate & Sherman, for receiver of Third Ave. R. R. and Forty-Second St. Ry. Co.

Kellogg & Rose, for Barber Asphalt Co.

Daniel Burke, for American Hay Co.

Evarts, Choate & Sherman, for receiver of Dry Dock R. R.

Stetson, Jennings & Russell, for Lorain Steel Co.

Evarts, Choate & Sherman, for receiver of Union Ry. Co.

LACOMBE, Circuit Judge. The propositions submitted on this petition may be more conveniently discussed separately, since the facts are not the same in the case of each road.

### 1. The Manhattan Elevated Road.

On April 3, 1899, formal contracts were entered into between the Manhattan Railway Company and the four surface roads, which are defendants in those cases, providing for the transfer of passengers from elevated to surface road, and vice versa, upon the payment by the passenger of three cents in addition to the regular fare of five cents. The eight cents for the whole trip, including transfer, was to be collected by the road on which the passenger began his journey, and the eight cents was to be divided equally between the two roads on which the passenger was carried, an accounting being had each month. These contracts·expired by their own limitation on May 1, 1904. On April 29th and May 3d of that year, by an exchange of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

letters between the presidents of the respective roads, the foregoing agreement was continued from year to year, with the provision that the relation might be terminated at any time by service of a written notice of 90 days from either party. The practice of issuing these transfers has since continued, without any other formal action renewing or extending the contract. The receiver has made an examination, and finds that the result of such exchange of transfers during the months of February and March was a net balance against the four surface roads and in favor of the elevated road of $8,476.36. Because this is obviously unprofitable, and because there are very large opportunities for fraud in the purchase and sale of these transfer tickets, the receiver proposes to terminate the existing practice.

Notice of this application was duly given to the Manhattan Railway Company, which makes no opposition; and there seems to be no obligation, either statutory or contractual, which requires the receiver to continue the existing practice. On behalf of one of the associations which has filed objections to the petition, it is suggested that as to any lines of the Union Railway constructed after this three-cent transfer went into effect, to the construction of which the abutting property owners gave their consent, such consent was given in reliance upon the continuance of the three-cent transfer. No such stipulation was incorporated in any such consent, so far as the receiver can find out, and the company receiving the consent cannot be held·to have thereby assumed obligations not therein expressed. It is also suggested that it will be a hardship to many residents of the Bronx to have any existing transfer system curtailed or discontinued. No doubt this is so, but this court is not prepared to hold that such circumstance alone is sufficient reason for requiring its receiver to continue an unprofitable service. It has also been suggested that the Public Service Commission, under section 49 of the act which created it, might require the roads to continue to sell and honor these transfers. Whether that section or any other one gives the Public Service Commission power to compel two independent roads to exchange transfers is a question of state law, the construction of a state statute which may more appropriately be left to the state courts. In the event of the receiver being called upon by the commission to take and give such transfers, he will furnish all the information which he, as operator of the road, may be able to procure, and he will notify the owners and security holders of the several roads now in his hands, and will see that they are given the opportunity to present whatever arguments they may wish to make in opposition. In the ultimate analysis it is the owners of and lienors on the property whose interests would really be affected by such a construction of the statute; the court and its receiver are custodians merely, and are not concerned with its future.

There seems to be no good reason why the exchange of transfers with the Manhattan Railway Company should not be terminated. The last-named company has been duly notified and waives the 90-day notice; but the discontinuance of these transfers should not be undertaken until after notice of intention to discontinue shall have been posted for 10 days in all cars run on such parts of the system as are affected·thereby.

### 2. The Westchester Electric Railroad Company.

This company has a line of track extending south on White Plains road to Fifteenth street, Williamsbridge. From that point south the lines of the Union Railway extend over White Plains road, Olin avenue, and Webster avenue. The Westchester Road runs its cars over Union tracks south of Fifteenth street, and the Union runs its cars on Westchester tracks north of Fifteenth street. Since there is thus a joint use of each other's tracks between the New York, New Haven & Hartford Station at Mt. Vernon and West Farms and Bedford Park Station, the transfer act of 1885 requires the roads there operating to exchange transfers for a single fare. The receiver wishes to stop such single fare transfers, and, in order to do so without violating the transfer act (Laws 1885, p. 525, c. 305), proposes to cease operating Union cars on Westchester tracks, and to prohibit the further use of Union tracks by Westchester cars. There has been no suggestion upon this hearing that such a change of operation was not within the power of the receiver of either road; there is no contract between them securing to either the use of any portion of the other's tracks. The receiver for the Westchester Road calls attention to the fact that there are no waiting room facilities for persons who, by reason of the discontinuance of the present through lines, might have to change cars at the junction point (corner Fifteenth street and White Plains road, Williamsbridge), but it is understood that the receiver of the Union does not propose to abrogate the present system till such facilities are provided.

The important question is whether, after the joint use of tracks shall cease, it is within the power of the receiver of the Union Railway to refuse to accept transfer slips from Westchester Railroad passengers, bound south, who may change into the cars of his line at the junction point. A hearing was given some weeks ago, when all interested had full opportunity to present their views. Several of those who then appeared have asked that the matter be sent to a master, but that is unnecessary; the documents and affidavits already submitted make the situation quite clear, and there is no apparent conflict as to the facts.

Except for a document hereinafter referred to, no contract or agreement was ever entered into by the Union Company undertaking to give to passengers coming from points in Westchester county on the line of the Westchester Company conveyance, without further payment, over the lines of the Union Railway. At the time when certain franchises were granted to the Westchester Company, its entire capital stock was owned by the Union, and offices in both companies were held by the same individuals; these individuals were applicants, on behalf of the Westchester Company, for the franchises in question, and, as an argument in favor of the grant thereof, made much of the relations existing between the two companies. The Union Company also indemnified a surety company which became the guarantor of the Westchester Company on certain bonds required as a condition of granting franchises to the latter company. But no agreement or promise of the Union Company is shown, and the court is not satisfied that the acts and statements of the persons who were then its officers

can be held to estop the Union Company, which has long since parted with its Westchester stock, from insisting that its obligations shall be measured only by the contracts it entered into and by the requirements of the statutes.

There has been put in evidence a contract between Mr. B. L. Fairchild, of Pelham, and the Union Railway Company, dated June 11, 1898; also a further supplemental contract between the same parties dated October 25, 1899. These need not be recited at length, nor need any of the objections to them be discussed, because the changes now proposed do not conflict with any privileges which the documents purport to secure. They provide for carrying passengers—

"either upon through cars or by transfers at Fordham, by electric railway service from New Rochelle through the Old Boston Post Road or Colonial Avenue, in the village of Pelham through Sixth St. from the Pelham line in Mount Vernon, and southerly from Woodlawn Station to Tremont at 177th St. and Third Avenue in the city of New York. The fare from Pelham to any point along the route * * * and connecting lines shall be at no time greater than from Mount Vernon to such points."

The Union Company receiver proposes to continue his service so that passengers from New Rochelle and the other points named can find cars ready to take them from the city line to Tremont, and does not propose to charge any greater rate of fare for passengers coming from Pelham than for those coming from Mt. Vernon.

As to the Westchester Company, however, the situation is very different. In November, 1898, the company obtained from the local authorities of Mt. Vernon franchises to operate its road in certain streets and avenues, with the proviso:

"That on payment of a five cent fare any person shall be carried over the lines of said railroad and any railroad controlled and operated by said company, or by which said company is or may be controlled and operated, through and from the city of Mount Vernon, to One Hundred and Twenty Ninth St. in the Borough of Manhattan, and to and over any of the lines of the Union Railway Company of New York City, at which transfer points have already or may hereafter be established, north of the Harlem River. * * * Upon failure to comply with these conditions this franchise shall be forfeited to the city of Mount Vernon."

Counsel for the Union Company receiver contends that this provision no longer applies, since the Westchester Company is not now controlled or operated by the Union Company. There is force in the contention, but it need not be here discussed. The pending petition will be disposed of upon the assumption that should the Westchester Company be unable to secure transportation, for a single five-cent fare, of its passengers from Mt. Vernon over the Union Lines to 129th street, it will be within the power of the local authorities of that city to sue upon bond and to forfeit the franchises granted in November, 1898. The same assumption may fairly be made as to certain other franchises granted to that company on similar conditions by the villages of Pelham Manor, North Pelham, and Bronxville.

When it became apparent that the carrying out of the changes proposed by the receiver might, at the pleasure of local authorities, result in the destruction of franchises belonging to another corporation, it seemed desirable that notice of this application should be given to

all who had invested in such franchises. The entire capital stock of the Westchester Company was originally owned by the Union Company, and was subsequently transferred to the Third Avenue Railroad Company; it is included in a mortgage by that company to the Central Trust Company as trustee, and the equity has been transferred to the Metropolitan & New York City Railway. The Westchester Company has an outstanding mortgage dated June 2, 1893, which contains an "after-acquired property" clause and covers these franchises. The trustee under this mortgage, the Central Trust Company, and the present holders of the equity of the stock have all been notified of this application; some of them have appeared, but no one makes any objection. It is suggestive that, when it is proposed to take action which may be expected to result in the forfeiture of a franchise, no one who has invested in such franchise as owner or mortgagee raises any protest. Apparently the prospect of developing any value out of these particular franchises under existing conditions is not hopeful, and the figures given by the state receiver showing receipts and disbursements during his operation of the entire system of the Westchester Company are not encouraging.

Upon the record here presented, there seems to be no legal obstacle to the proposed action of the receiver of the Union Railway Company. Such a course would manifestly cause much inconvenience and some loss to residents in the city and villages affected; it may be that the various local authorities, the state receiver, and the petitioning receiver may be able to agree to some modifications which will meet with general acceptance. The situation is well expressed in the brief of counsel for the village of Pelham, as follows:

"It may be impossible to carry a passenger without loss from Mt. Vernon or Pelham to 129th street, a distance of about 12 miles. But carrying a passenger a distance of about 3 to 4 miles from Mt. Vernon to the Bronx Park Station of the Elevated would probably represent a profit. There should be some middle ground where the interests of the communities and the railroad might meet."

The petitioning receiver will, therefore, first endeavor to make some arrangement which will be satisfactory to all interests; but, if unable to do so, he may make such changes in service as the law permits and the business interests of the property in his custody may require. No change, however, should be made without giving public notice thereof 30 days in advance.

### 3. The Yonkers Railway.

On the Bronx River road north of the city line, Union cars now run on Yonkers Railway tracks; on the same road south of the city line, Yonkers cars run on Union tracks. The Union also runs its cars on Jerome avenue northerly from the city line on Yonkers tracks. In order to avoid this joint use of tracks and consequent application of the transfer act, the receiver proposes to discontinue these services, and thereafter to discontinue the exchange of single-fare transfers. The situation is substantially the same as that outlined above in discussing the Westchester Road. Certain franchises granted by the city of Yonkers to the Yonkers Railway may be forfeited if the present

mode of operation is not maintained. The bulk of the stock of this company is held as that of the Westchester is, but 75 shares are the property of individuals who have been notified of this proceeding. The trustee of a mortgage which covers these franchises as after-acquired property has also been notified. Some of the parties notified have appeared, but none object. The receiver will proceed as indicated in the Westchester case.

One line now operated by the Yonkers Company presents a different situation. On Broadway, Yonkers cars run south on Union tracks from the city line to Kingsbridge. These cars maintain the only service on that line, because there is not at present any connection with other parts of the Union System, and there are no car barns or repair shops on Broadway south of the line. Power is furnished by the Third Avenue Company, but neither for the power nor for use of the tracks does the Yonkers Road pay anything. The receiver asks to terminate this arrangement unless provision can be made for the payment of a fair rent for use of tracks and power. This seems a reasonable proposition, but the record indicates that it may be difficult for the receiver of the Yonkers Company to pay anything. In order to comply with the terms of some of its franchises, he now buys subway tickets from the Interborough Company at five cents and sells them to Broadway passengers at three cents. But that is no reason why the Third Avenue Company should not be paid for its power and the Union for the use of its tracks. The same situation exists here as in the other cases—as to forfeiture of franchises, etc. The receiver will first undertake to make some satisfactory arrangement with the state receiver and the local authorities, and, failing that, he will take steps to make proper connections and to operate the Union tracks himself from the city line to Kingsbridge. Thirty days' public notice will be given of any proposed change.